UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

    v.                            CRIMINAL NO.4:08cr144

EDWARD DEMOND DAVIS,

       Defendant.

## OPINION AND ORDER

This matter comes before the court on Defendant's "Motion for Sentence Reduction Under 18 U.S.C. § 3582(c)(1)(A) (Compassionate Release)" ("Motion"), filed pro se and subject to defect on April 26, 2021, with the defect lifted on June 29, 2021. ECF No. 559 at 22; ECF No. 567. For the reasons explained below, Defendant's Motion is **DENIED**.[1]

### I. PROCEDURAL HISTORY

On November 17, 2009, Defendant pleaded guilty to Counts One, Five, Thirteen, and Twenty-Eight of a forty-count, multiple-defendant Superseding Indictment. ECF Nos. 30, 294, 295. Count One charged Defendant with Conspiracy to Engage in

---

[1] On September 12, 2021, Defendant also filed, subject to defect, a letter Motion for Reconsideration of this court's Order denying his request for court-appointed counsel (ECF No. 570). ECF No. 573. Defendant remedied the defect on September 21, 2021. ECF No. 582-1 at 3. Because Defendant did not explain why that Order should be reconsidered, and because the court **FINDS** that no material developments justify reconsideration, his Motion for Reconsideration is **DENIED** for the reasons stated in the Court's earlier Order. ECF No. 570.

Racketeering Acts, in violation of 18 U.S.C. § 1962(d). ECF No. 30 at 2-23. Count Five charged Defendant with Discharging a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1) and 2. Id. at 29. Count Thirteen charged Defendant with Brandishing a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1). Id. at 37. Count Twenty-Eight charged Defendant with Use of a Firearm Resulting in Death, in violation of 18 U.S.C. § 924(c)(1) and (j). Id. at 55. On March 16, 2010, the court sentenced Defendant to imprisonment for life plus four hundred twenty (420) months, consecutive.[2] ECF No. 337 at 2.

Defendant filed the instant Motion subject to defect on April 26, 2021, with the defect lifted on June 29, 2021, requesting release from incarceration. ECF Nos. 559, 567. In his Motion, Defendant claims four reasons to warrant a reduction in sentence:

> **(1)** the spread of the novel Coronavirus ("COVID-19") and its effect on his physical and mental health conditions, ECF No. 559 at 5-7, 22;

---

[2] The term of imprisonment consisted of life sentences on Counts One and Twenty-Eight, to be served concurrently; one hundred twenty (120) months on Count Five, to be served consecutively to Count Twenty-Eight; and three hundred (300) months on Count Thirteen, to be served consecutively to Count Twenty-Eight. ECF No. 337 at 1-2. On Counts Five and Thirteen, the court imposed the then-applicable statutory minimum sentences. See ECF No. 568 at 1.

**(2)** the effect of his stacked sentences under 18 U.S.C. § 924(c) in light of <u>United States v. McCoy</u>, 981 F.3d 271 (4th Cir. 2020);[3]

**(3)** a desire to be with his family, ECF No. 559 at 6-8; and

**(4)** his rehabilitation, <u>id.</u> at 7-8.

The United States filed a Response in Opposition on July 29, 2021, ECF No. 571, and additional documents supporting its position on September 21, 2021, ECF No. 577. Defendant filed a Reply on September 14, 2021. ECF No. 575.[4] The next day, Defendant filed a "Motion for Legal Notice and Demand." ECF No. 578. The court **CONSTRUES** this filing as a submission, rather than a motion, as it did not request any particular form of relief. <u>Id.</u> Instead, Defendant used it to "serve notice of record" that he "claim[s] exemption" to receiving the COVID-19 vaccine on

---

[3] The court notes that Defendant did not clearly invoke his stacked sentences as a basis for a reduction in sentence. He did, however, mention the issue in two submissions to the court. First, in his Motion, he noted that "the First Step Act's § 924(c) stacking concerns" "have [Defendant] wondering whether or not [he] can go on each day to survive incarceration." ECF No. 559 at 5. Second, he noted in his Reply that "the government [a]dmits that [he] has stacked § 924(c) [sentences] . . . ." ECF No. 575 at 2. In light of this, the court **CONSTRUES** Defendant's Motion to include an argument that Defendant's stacked § 924(c) sentences serve as a basis for a reduction in his sentence. <u>See, e.g.</u>, <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (noting that <u>pro se</u> filings are to be liberally construed).

[4] This filing was styled as a "Motion to Response to United States to Reconsider Motion for Compassionate Release." ECF No. 575. However, the context and substance of this submission make clear that it was Defendant's Reply brief.

religious grounds under the First Amendment to the United States Constitution. See id. at 1; U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . .").

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

"[T]he default position . . . is that a sentencing court 'may not modify a term of imprisonment once it has been imposed.'" United States v. High, 997 F.3d 181, 185 (4th Cir. 2021) (quoting 18 U.S.C. § 3582(c)). Nonetheless, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), the court may modify a term of imprisonment if it finds that "extraordinary and compelling reasons warrant such a reduction." Id. Before the court may consider such a motion filed by a defendant, however, the defendant must have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or there must have been a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." Id. § 3582(c)(1)(A).

Defendant submitted a request for compassionate release to the warden of the institution where he is incarcerated on March 16, 2021. ECF No. 559 at 22. Notably, Defendant's request did not raise his consecutive § 924(c) sentences, rehabilitation, or need to reunite with his family as justifications for a sentence reduction. Id. The warden responded to Defendant's request on

4

March 29, 2021, explaining that because Defendant is "a Care Level one inmate," he did not qualify for compassionate release through the Bureau of Prisons' ("BOP") administrative process and would "need to file through the courts [himself]." Id. at 3, 21.

The United States maintains "that a defendant must present the same claims in support of compassionate release to BOP that he presents to the Court," and that "[b]ecause Defendant never presented his claim about sentencing disparity to BOP, he cannot assert if for the first time before [the court]." ECF No. 571 at 20-21. The court has previously noted the split of authority concerning this issue. See United States v. Bryant, No. 2:92-cr-88, slip op. at 2-5 (E.D. Va. Jan. 13, 2021) (Smith, J.) (identifying split but declining to resolve the question of law where waiver of exhaustion requirement was appropriate). As in Bryant, the court finds that Defendant may very well have satisfied the administrative exhaustion requirement, in line with United States v. Brown and other cases similarly holding. 457 F. Supp. 3d 691, 697 (S.D. Iowa 2020) (noting that 18 U.S.C. § 3582(c)(1)(A) "does not . . . state that the reasons presented to the warden must mirror those presented to the district court."). However, the court does not need to resolve this question of law.

Even if Defendant has not exhausted his administrative remedies, as the United States urges, the court concludes that

waiver of the exhaustion requirement is warranted under the circumstances of this case. See Casey v. United States, No. 4:18-cr-4, 2020 WL 2297184, at *1 (E.D. Va. May 6, 2020) (Jackson, J.) (noting that the exhaustion requirement can be waived when "the relief sought would be futile upon exhaustion"). The warden's response to Defendant's request made clear that the BOP would not bring a motion for compassionate release on his behalf and he would "need to file through the courts [himself]." See ECF No. 559 at 21. Therefore, the court finds any attempt by Defendant to raise additional arguments before the BOP would be futile, and that waiver of the exhaustion requirement is appropriate. See United States v. Muhammad, 16 F.4th 126, 130 (4th Cir. 2021) (holding that the exhaustion requirement "is a non-jurisdictional claim-processing rule," and therefore "may be waived or forfeited").

### III. MERITS OF DEFENDANT'S MOTION

For a court to reduce a defendant's sentence under § 3582(c)(1)(A)(i), it must find that "extraordinary and compelling reasons" justify such a reduction. The defendant bears the burden of showing that this requirement is satisfied. See, e.g., United States v. Newton, 996 F.3d 485, 488 (7th Cir. 2021); United States v. Noel, No. 3:08-cr-186-03, 2021 WL 1602402, at *2 (E.D. Va. Apr. 23, 2021) (Payne, J.). Even if a defendant carries his burden, a court may only reduce his sentence "after considering

6

the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A). Any such reduction must also be "consistent with applicable policy statements issued by the Sentencing Commission." Id.; see United States v. McCoy, 981 F.3d 271, 275-76 (4th Cir. 2020).

In McCoy, the Fourth Circuit held that, in the context of prisoner-filed § 3582(c)(1)(A) motions, "there currently exists no 'applicable policy statement'" because the Commission has not issued a policy statement since the passage of the First Step Act. 981 F.3d at 281-82 (alteration omitted). Therefore, until the Sentencing Commission issues an updated policy statement, "district courts are 'empowered to consider <u>any</u> extraordinary and compelling reason for release that a defendant might raise.'" <u>Id.</u> at 284 (alteration omitted) (quoting United States v. Brooker, 976 F.3d 228, 230 (2d Cir. 2020)); see United States v. Davis, No. 21-6960, 2022 WL 127900, at *1-2 (4th Cir. Jan. 13, 2022) (holding district court abused discretion in determining that certain claims "categorically" could never "establish a sufficient reason for release."). In particular, the Fourth Circuit held that courts "may consider, under the 'extraordinary and compelling reasons' inquiry, that defendants are serving sentences that Congress itself views as dramatically longer than necessary or fair." McCoy, 981 F.3d at 285-86.

Although the policy statement in United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 1B1.13 is no longer binding on this court in this case after the Fourth Circuit's decision in McCoy, the court finds certain of its provisions useful in addressing the instant Motion. For example, the court will still consider "the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," U.S.S.G. § 1B1.13, and whether "[t]he defendant is . . . a danger to the safety of any other person or to the community," id. § 1B1.13(2), because these considerations remain highly relevant to whether a reduction in sentence is warranted in this case.

## A. EXTRAORDINARY AND COMPELLING REASONS

Defendant offers four matters which he contends amount to "extraordinary and compelling reasons" for a reduction in sentence, pursuant to § 3582(c)(1)(A)(i). For the reasons explained below, the court finds that none of these issues, individually or in combination, amount to an "extraordinary and compelling reason[]" for such a reduction. See Davis, 2022 WL 127900, at *2 (vacating denial of compassionate release where there was "no indication that the district court considered [the defendant's] circumstances, as a whole.").

### 1. Effect of COVID-19 on Defendant

Defendant explains that he "fear[s] contracting" COVID-19, and argues that he faces an increased threat of serious illness or

8

death from the virus due to his underlying physical and mental health issues. ECF No. 559 at 5-7, 22.[5] "In the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease <u>and</u> a particularized risk of contracting the disease at his prison facility." <u>United States v. Feiling</u>, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020) (Novak, J.) (emphasis added).

### i. Particularized Susceptibility

"To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer from a medical condition identified by the Centers for Disease Control and Prevention ("CDC") as a COVID-19 risk factor." <u>United States v. Chandler</u>, Crim. No. 3:15-mj-122, 2020 WL 6139945, at *5 (E.D. Va. Oct. 19, 2020) (Novak, J.) (citing <u>United States v. Beahm</u>, No. 1:05-cr-249, 2020 WL 4514590, at *2 (E.D. Va. Aug. 5, 2020) (Hilton, J.); <u>United States v. White</u>, No. 3:18-cr-61, 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020)

---

[5] It unclear whether Defendant argues that each of his physical and mental health complaints justify his early release due to the ongoing pandemic, or instead provide sufficient justification even absent the threat of COVID-19. The court has analyzed all of these claims under the COVID-19 susceptibility analysis. Because the court ultimately concludes that Defendant does not state a basis for relief during an ongoing pandemic, it also concludes that his medical complaints cannot satisfy the § 3582(c)(1)(A)(i) standard on a standalone basis.

(Hudson, J.)). However, to satisfy the "particularized susceptibility" requirement, a defendant must do more than merely point to a condition that constitutes a COVID-19 risk factor. See Chandler, 2020 WL 6139945, at *5 (finding requirement not satisfied where the defendant's asthma was "mild and intermittent"). Instead, defendants must provide evidence establishing why their condition is so severe that it warrants a sentence reduction. See id. (noting that the relevant medical records did not indicate that Defendant's asthma was severe enough to constitute "an extraordinary and compelling reason for his compassionate release").

Here, Defendant explains that he is susceptible to serious illness or death from COVID-19 because he has "lumps" on the right side of his neck which he suggests might be cancerous. ECF No. 559 at 22. He represents that they are causing "chest problems and breathing Issue's," and that he is "very scared that [he] may pass away in [his] cell without the proper help . . . that's supposed to be provided too [him] thru [USP Lee]." Id. (errors in original). Defendant also argues that his mental health conditions warrant his release. See id. at 5-7. Among other things, he explains that he has "been experiencing something which [he] comprehend[s] as a current and continuing form of [Post-Traumatic Stress Disorder]," has "developed a paranoia," is "wondering whether or not [he] can go on each day to survive incarceration," believes he is "suffering

10

from deep depression," and spends his days "in bed and try[ing] not to socialize with anyone." Id.

First, nothing in the record demonstrates that the lumps on the right side of Defendant's neck are cancerous or increase his risk of severe illness or death should he contract COVID-19. This complaint was thoroughly investigated by BOP medical personnel on multiple occasions. See generally ECF No. 557-1. Defendant first presented to BOP medical staff to address the lumps on March 12, 2021. Id. at 23. The treating provider observed that Defendant had two swollen lymph nodes on the right side of his neck, and noted that this was due to "[p]ossible allergies." Id. at 23. He also noted that Defendant had only recently begun his allergy medication. Id.

BOP staff conducted a follow-up exam on March 19, 2021, and noted a lump on the right side of Defendant's neck. Id. at 16. The provider diagnosed it as an enlarged lymph node "likely reactive in nature and presentation," due to Defendant's scalp infection. Id. at 14-19. Defendant denied any shortness of breath, wheezing, or cough during the visit, and medical staff also observed that Defendant was not in "acute distress." Id. at 16-17. Staff prescribed Defendant medicated shampoo and oral antibiotics, and ordered additional testing to further evaluate the lump. Id. at 18-19.

11

The issue ultimately resolved favorably for Defendant. During an evaluation on March 30, 2021, Defendant stated: "I feel better and my scalp is improving. [T]hat lump on my neck is now where I can't hardly feel it. [T]hank you." Id. at 11. The examining provider noted that Defendant was not in acute distress, Defendant's scalp infection had improved, and that the size of the lump on Defendant's neck had decreased. Id.

When Defendant was one again examined on April 30, 2021, providers noted that his "enlarged lymph nodes" diagnosis had resolved, that Defendant was "in no acute distress," and that "no abnormal physical findings" were uncovered. Id. at 5-6. Medical staff specifically noted that Defendant did not present with any growths, masses, lymphadenopathy,[6] or deformities on his neck. Id. at 5. Collectively, these findings do not validate Defendant's unsupported assertion that his lumps might be cancerous, and do not establish a condition which increases Defendant's risk of severe illness or death should he contract COVID-19.[7]

The court also concludes that Defendant's mental health conditions do not justify his release. According to the CDC,

---

[6] Lymphadenopathy is a "disease of the lymph nodes, usually with swelling . . . ." Lymphadenopathy, Dorland's Illustrated Medical Dictionary (33d ed. 2020).

[7] CDC, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions /people-with-medical-conditions.html.

"[h]aving mood disorders, including depression, . . . _can_ make [individuals] more likely to get severely ill from COVID-19."[8] Though he represents that he is now seeking out mental health services, Defendant explains that he was "afraid to seek treatment while incarcerated" because "the prison staff do not provide [reliable] information nor proper care for prisoners . . . ." See ECF No. 559 at 6. Yet, Defendant has not presented any example of deficient BOP medical care, his medical records show that he has received counseling concerning "Access to Care" no less than five times since March 2021, and he has been examined by BOP medical staff on multiple occasions. ECF No. 577-1 at 39-41 ("Access to Care" counseling).[9] In fact, the BOP diagnosed Defendant with "Panic Disorder" in 2015, illustrating its ability to care for Defendant's mental health should he seek BOP assistance. Id. at 42.

Nothing in this record suggests that the BOP is unwilling or unable to provide Defendant with mental health treatment, should he seek it. Moreover, Defendant's medical records do not identify any underlying physical comorbidities that constitute COVID-19 risk factors, and Defendant did not submit evidence suggesting

---

[8] See _supra_ note 7 (emphasis added).

[9] Defendant's medical records show that he was examined by medical personnel on at least five dates: March 12, 2021; March 19, 2021; March 30, 2021; April 30, 2021; and June 21, 2021. ECF No. 577-1. However, at no time during this period was Defendant in any dire or immediate medical emergency. See id.

that that his mental state has left him immunocompromised. <u>See</u> <u>Richburg v. United States</u>, No. 4:18-cr-43, 2020 WL 6064351, at *3 (E.D. Va. Oct. 14, 2020) (Jackson, J.) (no particularized susceptibility where defendant "suffer[ed] from extensive mental illnesses," but his "medical records [did] not indicate any underlying physical health issues that place[d] him at a higher risk for serious illness if he contract[ed] COVID-19"). Though the court is sympathetic to Defendant's psychological struggles with incarceration, on this record, Defendant cannot create an "extraordinary and compelling reason[]" justifying release under § 3582(c)(1)(A)(i) by refusing to seek mental health support from the BOP.[10]

Indeed, Defendant's own conduct undercuts his argument that the BOP is providing deficient care, or that his medical conditions justify a reduction in sentence. On January 26, 2021, Defendant "became belligerent and displayed aggressive behavior and insolence," when BOP staff attempted to evaluate his complaints. 577-1 at 28. When "told he would need to be screened for COVID-19 based on his symptomology his behavior became more aggressive," and the provider ended the exam. <u>Id.</u> Even though he was housed in a unit with multiple COVID-19 positive inmates, Defendant

---

[10] Several avenues for mental health support are available to inmates incarcerated at a BOP facility. <u>See</u> <u>generally</u>, Fed. Bureau of Prisons, <u>Mental Health</u>, https://www.bop.gov/inmates/custody_and_care/mental_health.jsp.

ultimately refused testing, and was placed in quarantine. Id. at 26. Defendant's decision to turn away BOP medical care and failure to seek mental health treatment run against his assertions that he "fear[s] contracting" COVID-19 and that he is "very scared that [he] may pass away in [his] cell without the proper help . . . ." See ECF No. 559 at 6, 22.

Finally, an analysis of Defendant's susceptibility to COVID-19 would be incomplete without a discussion of his vaccination status. Defendant refused the COVID-19 vaccine on March 24, 2021. ECF No. 577-1 at 58. On September 15, 2021, Defendant filed a submission with the court asserting that he was "exercis[ing] [his] Religious right and claim[s] exemption to any vaccine of any kind including the COVID-19 vaccine . . . ." See ECF No. 578 at 1.

For the purpose of analyzing Defendant's Motion, the court assumes that his religious beliefs are sincerely held. In this case, however, it is unnecessary to delve into the relevant First Amendment questions that refusing vaccination based on such beliefs may present. Vaccinated or not, the evidence before the court fails to establish that Defendant's conditions are serious enough to constitute a "particularized susceptibility" to COVID-19. See Chandler, 2020 WL 6139945, at *5 (finding requirement not satisfied where Defendant's asthma was "mild and intermittent"). Notably, there is no evidence that BOP staff are

unable to effectively treat Defendant's mental and physical health concerns at his institution. Indeed, Defendant has been seen multiple times for his physical complaints, has turned away care, and concedes that he has consciously decided not to seek treatment for his mental health concerns. Moreover, regardless of his vaccination status, Defendant has refused COVID-19 testing. ECF No. 577-1 at 26-28.

Therefore, without considering the implications of Defendant's vaccine refusal, the court concludes that Defendant has failed to satisfy the "particularized susceptibility" prong. Instead, Defendant's ailments are apparently, at worst, "chronic conditions that can be managed in prison [and thus] are not a sufficient basis for compassionate release." United States v. Ferguson, No. 3:04-cr-13-01, 2021 WL 1701918, at *3 (E.D. Va. Apr. 29, 2021) (Payne, J.) (quoting United States v. Ayon-Nunez, No. 1:16-cr-130, 2020 WL 704785, at *2-3 (E.D. Cal. Feb. 12, 2020)).

### ii. Particularized Risk of Contracting COVID-19

Defendant has not shown that he faces a particularized risk of contracting COVID-19 at his facility, USP Lee. A large number of inmates and staff at this facility have been inoculated against

COVID-19 with vaccines shown to be highly effective[11] at preventing serious COVID-19 illness.[12] The court recognizes that, as of January 24, 2022, USP Lee had forty-two (42) active cases of COVID-19 among inmates, and six (6) active cases among staff members.[13]

However, Newport News and Lynchburg, Virginia, the two places that Defendant is contemplating living should he be released, are both experiencing substantially higher rates of COVID-19 spread.[14] The vaccination rates among residents of these cities are also lower than that of the prisoner population at USP Lee.[15] These

---

[11] CDC, Key Things to Know About COVID-19 Vaccines, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html.

[12] As of January 24, 2022, 239 staff members and 950 of the 1,310 prisoners at USP Lee were fully vaccinated against COVID-19. See Fed. Bureau of Prisons, COVID-19 Vaccine Implementation, https://www.bop.gov/coronavirus/ (vaccination statistics); Fed. Bureau of Prisons, USP Lee, https://www.bop.gov/locations/institutions/lee/ (number of inmates). This equates to a roughly 72% vaccination rate among the inmate population.

[13] See Fed. Bureau of Prisons, COVID-19 Cases, https://www.bop.gov/coronavirus/. Notably, no inmate deaths have resulted at the facility from complications with COVID-19, and 453 prisoners have recovered from COVID-19 infections. See id.

[14] As of January 24, 2022, Newport News and Lynchburg were experiencing 283 and 141 seven-day average daily numbers of new COVID-19 cases reported. Va. Dep't of Health, COVID-19 Data in Virginia-Locality, https://www.vdh.virginia.gov/coronavirus/covid-19-in-virginia/covid-19-in-virginia-locality/.

[15] As of January 24, 2022, only 59.2% of Newport News residents and 45.2% of Lynchburg residents were fully vaccinated

numbers leave the court unconvinced that living in Newport News or Lynchburg would provide Defendant with significantly more protection from COVID-19 than him remaining at USP Lee. See Feiling, 453 F. Supp. 3d at 841-42 (denying motion for compassionate release where defendant "fail[ed] to demonstrate how his release on home confinement [would] significantly reduce his likelihood of contracting COVID-19").

Accordingly, Defendant has not demonstrated a particularized susceptibility to COVID-19, or that he faces a particularized risk of contracting the virus at USP Lee. Therefore, Defendant has not shown extraordinary or compelling reasons justifying a sentence reduction on this basis.

## 2. Stacked § 924(c) Sentences

Defendant argues that his stacked sentences constitute a basis for compassionate release under § 3582(c)(1)(A)(i).[16] The court begins its consideration of Defendant's argument with a discussion of the Fourth Circuit's McCoy decision.

### i. General Effect of McCoy

In McCoy, the defendants were each convicted of and sentenced on multiple offenses under 18 U.S.C. § 924(c) prior to the

---

against the disease. Va. Dep't of Health, COVID-19 Vaccine Summary, https://www.vdh.virginia.gov/coronavirus/covid-19-in-virginia/covid-19-vaccine-summary/; see supra note 12.

[16] See supra note 3.

18

December 21, 2018, passage of the First Step Act. 981 F.3d at 275, 277-79. At the time of their sentencing hearings, § 924(c)(1)(C) required a so-called "stacked" sentence for a "second or subsequent conviction" under § 924(c) -- that is, either enhanced mandatory minimum sentences of twenty (20) years or twenty-five (25) years for a second or subsequent § 924(c) conviction, depending upon the statute at the time of conviction. See id. at 275, 277, 278 n.3. Pursuant to then-applicable law, "a conviction was treated as 'second or subsequent,' triggering the [enhanced mandatory] minimum sentence, even if the first § 924(c) conviction was obtained in the same case." McCoy, 981 F.3d at 275. The First Step Act "ended this practice . . . by clarifying that the [enhanced] mandatory minimum applies only when a prior § 924(c) conviction arises from a separate case and already 'has become final.'" Id. (emphasis added) (quoting 18 U.S.C. § 924(c)(1)(C)).

Although the First Step Act did not make this reform retroactive to cases in which defendants have already been sentenced, the defendants in McCoy filed motions for compassionate release, requesting that the court take into consideration the fact that their sentences would be much shorter if they were sentenced under the First Step Act. 981 F.3d at 274. The district courts granted the motions, and the defendants' sentences were reduced to time served. Id. at 274, 277, 279. The United States appealed, and the Fourth Circuit affirmed, holding that district

19

courts considering motions for compassionate release may properly consider "the length of [] defendants' sentences and the fact that those sentences would be dramatically shorter today . . . ." Id. at 285. The Fourth Circuit reasoned that while not all defendants convicted under § 924(c) should receive new sentences, courts may grant relief on a case-by-case basis where a defendant meets "the heightened standard of 'extraordinary and compelling reasons' . . . ." See id. at 287.

### ii. Specific Effect of McCoy on Defendant

Turning to this case, Defendant was convicted of violating § 924(c) in Counts Five, Thirteen, and Twenty-Eight of the Superseding Indictment.[17] Prior to these convictions, Defendant had not sustained a conviction for a violation of § 924(c). ECF No. 568 ("Presentence Investigation Report" (March 2010) ("PSR")) ¶¶ 53-56. However, because Defendant was convicted and sentenced prior to the passage of the First Step Act, the court was required to treat Defendant's conviction on Count Thirteen as a second or subsequent § 924(c) conviction subject to an enhanced mandatory minimum penalty. Accordingly, the court imposed the mandatory minimum

---

[17] Defendant did not receive a "stacked" sentence on count Twenty-Eight. On that count, the court imposed sentence pursuant to § 924(j) rather than § 924(c) because the underlying conduct resulted in the death of the victim. See ECF No. 337 at 1.

sentences of ten (10) years on Count Five[18] and twenty-five (25) years consecutive on Count Thirteen.

However, because the offense conduct giving rise to Count Thirteen did not occur after another § 924(c) conviction had "become final," Defendant would face a sentence on Count Thirteen of only seven (7) years consecutive, if he were sentenced today for the same crime. See 18 U.S.C. § 924(c)(1)(A)(ii) (establishing seven (7) year mandatory minimum where a firearm is brandished); id. § 924(c)(1)(C) (providing that prior conviction must have "become final"). Hence, Defendant was sentenced to a term of imprisonment on Count Thirteen that is eighteen (18) years longer than "the sentence[] Congress now believes to be an appropriate penalty for [Defendant's] conduct." McCoy, 981 F.3d at 285.[19]

This disparity alone, however, does not automatically give rise to a compelling reason for a reduction in sentence. See

---

[18] See ECF No. 568 at 1. Ordinarily, the statutory minimum sentence for a first violation of 18 U.S.C. § 924(c) is five (5) years. Defendant was subject to a ten-year minimum sentence on Count Five because he discharged a firearm during the commission of the offense. ECF No. 337 at 1; see 18 U.S.C. § 924(c)(1)(A)(iii). Even if Defendant were sentenced after the passage of the First Step Act, the ten (10) year minimum sentence on Count Five would apply. 18 U.S.C. § 924(c)(1)(A)(iii).

[19] Defendant's sentence on Count Thirteen is also eighteen (18) years longer than the Guidelines sentence that would apply if he were sentenced today. The applicable Guidelines sentence for Count Thirteen would change as a result of the First Step Act's reduced statutory minimum sentence because "the guideline sentence [for a violation of § 924(c)] is the minimum term of imprisonment required by statute." U.S.S.G. § 2K2.4(b).

McCoy, 981 F.3d at 287 ("[O]nly those defendants who can meet the heightened standard of 'extraordinary and compelling reasons' may obtain relief."). When deciding to reduce the McCoy defendant's sentences to time served, the district courts "took seriously the requirement that they conduct individualized inquiries," and considered "such factors as the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served." McCoy, 981 F.3d at 288. The courts also found the defendants' lack of substantial criminal histories at the time they committed their offenses relevant. Id. at 277-79 (discussing criminal histories and noting that none of the defendants had served jail time).

Though Defendant was relatively young at the time he committed his offenses and has served a substantial term of imprisonment thus far, that is where his similarities with the McCoy defendants end. At the heart of the McCoy decision was the fact that, absent court intervention, the defendants were destined to spend more days in prison, serving sentences that were both unusually long and well beyond what Congress later determined "to be an appropriate penalty for [the defendants'] conduct." See id. at 285-86 (citing United States v. Redd, 444 F. Supp. 3d 717, 723 (E.D. Va. 2020) (Trenga, J.)). Defendant is not in this situation, as his "stacked" § 924(c) sentences run consecutive to two

22

concurrent life sentences. ECF No. 337 at 2. Thus, alleviating the effect of Defendant's "stacked" § 924(c) conviction would have no effect at this time on his overall term of confinement. See McCoy, 981 F.3d at 277, 279 (noting that the defendants' sentences were reduced to time served).

Nevertheless, the court considers this disparity and recognizes that the lack of immediate practical effect of "un-stacking" Defendant's sentences does not disable the court from granting relief. Cf. Davis, 2022 WL 127900, at *1 (vacating denial of compassionate release where the court "failed to consider that the existence of a possibly void conviction" could support granting relief even though "voiding one of [the defendant's] convictions would not have resulted in an overall lower sentence for [the defendant]."). That said, the differences between Defendant and the McCoy defendants do not stop with this distinction. Defendant also had a substantial criminal history at the time he carried out the acts underlying his § 924(c) convictions.[20] Moreover, his record of post-sentencing conduct and rehabilitation is lackluster at best.[21]

Accordingly, upon an individualized inquiry into the facts and circumstances surrounding Defendant's offenses, as well as his

---

[20] See infra Part III.B.

[21] See infra Part III.A.4.

23

criminal history, personal characteristics, other arguments for compassionate release addressed herein, and post-offense conduct, the court concludes that Defendant's "stacked" § 924(c) sentences do not constitute an "extraordinary and compelling reason[]" justifying release. 18 U.S.C. § 3582(c)(1)(A)(i).

### 3. Desire to Be with Family

Under Application Note 1(C) to U.S.S.G. § 1B1.13, extraordinary and compelling reasons for a reduction in sentence exist only upon "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." After McCoy, however, the court finds that, as a general matter, a defendant's desire to reunite with family for reasons other than those outlined in § 1B1.13 could constitute an extraordinary and compelling reason for release. See United States v. Kibble, 992 F.3d 326, 331 (4th Cir. 2021) (noting that § 1B1.13 does not apply to prisoner-filed motions for compassionate release); United States v. Hankins, No. 2:12-cr-182, slip op. at 4-5 (E.D. Va. Mar. 16, 2021) (Smith, J.) (addressing potential for family circumstances to constitute "extraordinary and compelling reasons"). That said, Defendant's argument does not articulate an extraordinary or compelling reason for a reduction in sentence in this particular case.

24

Here, Defendant explains that his family members "constantly express the need for [him] to be home with them" and notes that his two sons are "starting to act out." ECF No. 559 at 6-7. However, Defendant does not identify a unique harm that could befall his family should the court maintain the status quo. For instance, Defendant has not argued that his children lack suitable caregivers. Indeed, it appears that the opposite is true. See ECF No. 568 (PSR) ¶¶ 78-79 (noting that Defendant's four minor children resided with their mother). Moreover, when imposing Defendant's sentence, the court considered that Defendant was a father. See id.

Thus, it appears to the court that Defendant's argument simply describes the unfortunate -- but unavoidable -- consequences of a father's commission of violent crimes and subsequent incarceration. Defendant, therefore, does not describe an "unusual set of facts" that compel this court to reduce his sentence. See Extraordinary Circumstances, Black's Law Dictionary (9th ed. 2009) (defining "extraordinary circumstances" as follows: "A highly unusual set of facts that are not commonly associated with a particular thing or event."). Given this, the court finds that Defendant's argument does not identify an "extraordinary and compelling" reason for early release, and thus cannot justify a sentence reduction under § 3582(c)(1)(A)(i). See Tucker v. United States, No. 2:17-cr-87, 2020 WL 4740480, at *3 (E.D. Va.

Aug. 14, 2020) (Jackson, J.) (finding Defendant's "subjective desire to raise her son," alone did not justify sentence reduction).

### 4. Rehabilitation and Other Postconviction Conduct

Defendant argues that his rehabilitation warrants his release under § 3582(c)(1)(A). See ECF No. 559 at 7-8. In his Motion, Defendant represents that, until the COVID-19 pandemic, he held a job, and that he "is not the same person [he] was on Dec. 10, 2008 but [has] refined [himself] to be a better man for [his] family [his] children and for all those who love [him] and want [him] to have a second chance at life . . . ." Id. at 7-8.

The court first notes that rehabilitation, alone, does not constitute an "extraordinary and compelling reason" for a reduction in sentence. 28 U.S.C. § 994(t). That said, the court recognizes that it may consider rehabilitation and other post-conviction conduct, when paired with other factors, as an "extraordinary and compelling reason[]" for relief. 18 U.S.C. § 3582(c)(1)(A)(i); see also Davis, 2022 WL 127900, at *1 ("successful rehabilitation efforts can be considered as 'one among other factors'" (quoting McCoy, 981 F.3d at 286 n.9)). On these facts, however, Defendant's rehabilitation argument does not articulate an extraordinary or compelling reason for a reduction in sentence in light of the full considerations herein of other

matters raised by Defendant and the factors under 18 U.S.C. § 3553(a).[22]

While the court commends Defendant for taking the steps he claims he has to improve himself, these steps are not "extraordinary." Instead, it appears to the court that, at best, Defendant has simply "do[ne] the things that prisoners are supposed to do" while incarcerated. United States v. Logan, 532 F. Supp. 3d 725, 735 (D. Minn. 2021) ("Prisoners are supposed to follow the rules, take classes, work at a job, and otherwise attempt to improve themselves. That a prisoner does so means that he has met baseline expectations, not that he has done something extraordinary.").

However, it is not entirely clear that Defendant has even satisfied this baseline expectation. The court notes that Defendant committed serious institutional infractions as recently as 2016. ECF No. 577-2 at 1-3 (noting sanctions for possessing dangerous weapons, fighting, refusing a work assignment, and phone abuse). The court is also disturbed by Defendant's "belligerent," "aggressive," and "insolen[t]" behavior aimed at BOP medical staff attempting to evaluate him on January 26, 2021. ECF No. 577-1 at 28. On this record, the court finds that Defendant's rehabilitation, in combination with the other reasons offered,

---

[22] See infra Part III.B.

does not warrant a reduction in sentence.

In sum, none of the four issues raised by Defendant, individually or in combination, amount to the "extraordinary and compelling reasons" required to justify a reduction in sentence under § 3582(c)(1)(A)(i).

## B. SECTION 3553(a) FACTORS

A court may only reduce a defendant's sentence under § 3582(c)(1)(A) "after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable . . . ." 18 U.S.C. § 3582(c)(1)(A). That said, "[s]ection 3582(c)(1) permits a district court to reduce a sentence in 'any case' – not just cases where a sentence has been substantially served; not just in cases involving low-level or non-violent offenses." Kibble, 992 F.3d at 334 (Gregory, C.J., concurring) (citing United States v. Gonzales, 520 U.S. 1, 5 (1997)). However, even if Defendant had presented "extraordinary and compelling reasons," the court finds that a reduction in sentence would not be proper in this case, as the § 3553(a) factors weigh heavily against Defendant's release. See Kibble, 992 F.3d at 330, 332 (majority opinion affirming denial of a motion for compassionate release where the defendant's "health conditions . . . amounted to extraordinary and compelling circumstances," but "the § 3553(a) factors counseled against a sentence reduction").

28

First, the court acknowledges and credits Defendant's representation that he maintained a prison job prior to the COVID-19 pandemic.[23] However, the court observes that Defendant's offense conduct was very serious, and that Defendant is currently serving two concurrent life sentences. See ECF No. 337 at 2; Kibble, 992 F.3d at 331 (recognizing that district courts are "entitled to consider the amount of time [defendants] ha[ve] served as one factor in the § 3553(a) analysis." (citing United States v. Chambliss, 948 F.3d 691, 694 (5th Cir. 2020); United States v. Pawlowski, 967 F.3d 327, 331 (3d Cir. 2020)). While the amount of time remaining on Defendant's sentence is not a dispositive factor, at this juncture, Defendant's initial steps towards rehabilitation do not outweigh the seriousness of Defendant's offense conduct. See United States v. Bowser, 539 F. Supp. 3d 572, 576-77 (E.D. Va. 2021) (Smith, J.) (denying motion for compassionate release, in part, on this basis). Though the court will not recite every aspect of it here, it will highlight of some of the most troubling facts.

Defendant's convictions stem from his participation in a years' long, violent drug conspiracy. See generally ECF No. 269 ("Statement of Facts" ("SOF")); PSR. From 2003 through 2009, Defendant was a member of the "Dump Squad" street gang, which trafficked an array of drugs in Newport News, Virginia. SOF ¶ 1;

---

[23] See supra Part III.A.4. (discussing Defendant's efforts at rehabilitation).

PSR ¶¶ 15, 20. Members of the gang "engaged in acts of narcotics distribution and violence, including murder, attempted murder, robbery, assault, arson and witness intimidation . . . ." SOF ¶ 1.

To achieve the gang's unlawful objectives, Defendant "purposely targeted rival drug dealers for robbery . . . ." Id. ¶ 5. Indeed, the PSR documents at least eleven (11) robberies (or attempted robberies) that Defendant participated in where he, or someone else, employed a firearm. PSR ¶¶ 26-29,31-37. During an attempted robbery in 2003, Defendant and an associate shot at their intended victims, one of whom was "grazed in the leg," while the other sustained serious injuries requiring multiple surgeries. SOF ¶ 6. During a 2005 robbery, Defendant approached his two victims "with a revolver drawn," and stole money from both. See id. ¶ 7. When Defendant attempted to rob rival drug dealers in 2006, he shot and killed one of his victims. Id. ¶¶ 8-11.

Defendant also employed violence to avoid facing the consequences of his crimes. On January 17, 2007, firefighters responded to the apartment of Tiarra Campbell, where she was discovered lying on the floor, suffering from severe burns. SOF ¶ 12; PSR ¶ 38. She was pronounced dead at the scene. PSR ¶ 38. "The medical examiner determined that the cause of death was strangulation, with blunt force and perimortem thermal injuries contributing." SOF ¶ 12. It was later determined that Defendant "burned and killed [Ms. Campbell] to prevent [her] from testifying

against him . . . ." PSR ¶ 48. Moreover, the PSR reveals multiple prior convictions for dangerous, violent crimes. PSR ¶¶ 53-54 (discussing convictions for Destruction of Property, multiple instances of Assault and Battery, Discharging a Firearm in Public, and Pointing/Brandishing a Firearm).

Defendant's extremely serious offense conduct, combined with Defendant's pre-offense criminal history, satisfies the court that the sentence originally imposed by the court is necessary "to promote respect for the law," "to afford adequate deterrence to criminal conduct," and, most importantly, "to protect the public from further crimes of the [D]efendant." 18 U.S.C. § 3553(a)(2)(A)-(C) (emphasis added).

## IV. CONCLUSION

Based on the foregoing, and having considered the effect of McCoy on Defendant's sentence, all the factors under 18 U.S.C. § 3553(a), and Defendant's offense conduct, criminal history, youth, and rehabilitation while incarcerated, Defendant's Motion for Compassionate Release, ECF No. 559, is **DENIED**. The Judgment entered on March 16, 2010, ECF No. 337, remains in full force and effect.

The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to Defendant, the United States Attorney at Newport News, and the BOP.

        **IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge
_____
REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

January 25 , 2022